Julio JANE, M.D., Plaintiff,

v.

THE BOWMAN GRAY SCHOOL OF MEDICINE–NORTH CAROLINA BAPTIST HOSPITAL; Wake Forest University Medical Center; Stephen I. Kramer, M.D.; Burton V. Reifler, M.D., M.P.H.; and Donald W. Peters, M.D. Defendants

No. 1:99CV01110.

United States District Court, M.D. North Carolina.

July 2, 2002.

Julius Levonne Chambers, Ferguson Stein Wallas Adkins Gresham & Sumter, P.A., Charlotte, NC, Julio Jane, M.D., Miami, FL, for plaintiff.

Anthony H. Brett, Womble Carlyle Sandridge & Rice, Winston–Salem, NC, for defendants.

## MEMORANDUM OPINION

TILLEY, Chief Judge.

This case is now before the Court on the Defendants' Motion for Summary Judgment [Doc. # 27] pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, Defendant's Motion for Summary Judgment is GRANTED.

## I.

The facts, in the light most favorable to the Plaintiff, Dr. Julio Jane, are as follows. Dr. Julio Jane was born in Miami, Florida, to parents of Cuban descent. Dr. Jane is

a native of the United States and describes his race as Hispanic. Dr. Jane was a resident in the psychiatry resident training program at Wake Forest University's Bowman Gray School of Medicine and Baptist Hospital (hereinafter referred to collectively as "The Medical Center") from July 1, 1994 through May 31, 1996. Residents are admitted to the Bowman Gray School of Medicine as a student in the residency program and are also hired under contract as "house officers" by Baptist Hospital, the teaching hospital. A decision to dismiss a student for failing to meet the standards of the School of Medicine carries with it the automatic termination of the resident's employment as a house officer. Dr. Jane transferred to the program from Duke University and began as a PGY3 (post graduate year 3) pursuant to a contract signed with The Medical Center in 1994 and renewed April 28, 1995.[1] Dr. Jane was terminated from the program effective May 31, 1996 and contends that his termination was based on his race, color and national origin.

During Dr. Jane's residency, Defendant Dr. Kramer was Director of Psychiatric Residency Education for the Department of Psychiatry and Behavioral Medicine, Defendant Dr. Reifler was a professor and Chairman of the Department of Psychiatry and Behavioral Medicine and Defendant Dr. Peters was Chairman of the Department of Psychology and Behavioral Medicine's Educational Policy Committee [hereinafter "EPC" or "the Committee"], which consists of various members of the Department responsible for overseeing the residency training program and the academic success of its participants.[2] Dr. Loretta Sylvia and Dr. Jeff Smith, who are not defendants in this lawsuit but who allegedly made comments about Dr. Jane's race, color, and national origin, were members of the EPC.

Prior to entering the program at The Medical Center, Dr. Jane was a resident at Duke Medical School. His contract with Duke was not renewed after his second year of a four-year residency because he was not performing at the level of other second year residents. Dr. Jane applied to the Medical Center because he did not want to move too far from Durham and he wanted a smaller program. Defendants Dr. Kramer and Dr. Peters both interviewed Dr. Jane and supported his admission to the program.

During Dr. Jane's residency, students in the residency program would participate in rotations in different clinical areas, such as the Mental Health Center, child psychiatry, and others. Each rotation was run by a supervisor who evaluated the students at the end of the rotation. A typical rotation would last for three months, and residents would participate in several rotations simultaneously. At the end of the three-month rotations, the rotation supervisors would submit a written evaluation of the student to Dr. Kramer. Dr. Kramer would compile the evaluations and give the students a "Clinical Performance Evaluation" at the end of the semester with a

1. Plaintiffs provide a contract dated April 28, 1995, but other statements in documents from both the Plaintiff and the Defendants show that the first contract signed by Dr. Jane would have been signed in 1994, since his training began then. The omission of the 1994 contract seems to be inadvertent.

2. Defendants point out that none of these named defendants is alleged to have been engaged in any conduct suggestive of ethnic bias. However, Dr. Jane does allege that Dr. Kramer engaged in conduct motivated by ethnic bias against him and that Dr. Peters made comments suggestive of ethnic bias. Whether or not Dr. Jane named the appropriate defendants is not significant because his claims are being dismissed.

summary of the student's performance and the individual evaluations attached. The students were evaluated on a numeric scale in fourteen to seventeen different categories related to skills required in psychiatric medicine. The student could receive the following numeric scores: 0—not assessed; 1—needs improvement; 2—satisfactory; 3—good; 4—superior. In addition to the numeric scores, supervisors could write comments on the evaluations.

Dr. Jane alleges that an evaluation in September of 1994 by Dr. Peters, who also served as Dr. Jane's rotation supervisor, contains language that is discriminatory. While Dr. Peters gave Dr. Jane 3's and 4's on the numeric evaluation scale, his written comment on the evaluation included a statement that Dr. Jane's "only negative aspect relates to occasional interpersonal rubs—when he is perceived as overly assertive or not giving others credit for their knowledge or expertise." Dr. Peters went on to say that "[t]his may be partly a language/expression based phenomena." [Jane Aff., Ex. 4]. Dr. Jane recalls that later in his first year Dr. Peters stated on one occasion that "because I was Hispanic that sometimes I may be thinking things in Spanish and when they come out translated in English, that people misinterpret what I'm saying." [Jane Aff., Ex. 2].

In the same time period, September of 1994, on the advice of his chief resident, Dr. Jane wrote a letter to Dr. Kramer about concerns he had with the Forsyth–Stokes Mental Health Center rotation. Dr. Jane's letter discussed his frustrations with the rotation and suggested improvements for the rotation. Following Dr. Kramer's receipt of the letter, Dr. Jane received an evaluation from Dr. Granger, his rotation supervisor for the months of July through September of 1994. Dr. Jane contends that Dr. Granger's actions were not adverse after the letter was written, despite the fact that Dr. Jane's criticism was of Dr. Granger's rotation. Dr. Jane states in his deposition that Dr. Granger's evaluation after the fact was good, despite the letter. In his deposition, Dr. Jane suggested that his letter made Dr. Kramer "upset" and subsequently affected the way Dr. Kramer treated Dr. Jane throughout the rest of his residency. [Jane Dep. at 63].

According to Dr. Jane, he did not have any discussions with faculty members until May of 1995,[3] when he was invited to a meeting with the EPC.[4] Dr. Jane states that he was told that the purpose of the meeting was to introduce him to the members of the EPC, but when he got there,

---

**3.** Documents presented by the defendants indicate that the Committee first issued a warning to Dr. Jane on March 28, 1995 and placed "performance parameters" on him because of lateness and absences. [Jane Dep., Ex. 2 at 4]. EPC meeting minutes dated March 21, 1995 and submitted by Dr. Jane contain a paragraph stating "there have been a number of complaints, including that [Dr. Jane] is late for clinics, leaves the Medical Center in the middle of clinics, double-books psychotherapy patients, does not document patient appointments in the schedule. Dr. Kramer will meet with him and inform him that his contract renewal in July is in serious jeopardy unless these unprofessional behaviors are corrected immediately." [Jane Dep., Ex. 12]. There-

fore, although Dr. Jane contends that no one directly spoke with him about his performance, there is evidence in the record that some action was taken regarding Dr. Jane's performance as early as March of 1995.

**4.** Dr. Jane contradicts himself in his deposition, stating first that he did not recall what the discussion at the May 1995 meeting was about and that he did not recall any discussions with anyone concerning his performance in his first year of training. Later during the same deposition, he recalls that the same May 1995 meeting took place to discuss his performance and that he was "in shock" when that meeting took place.

members of the EPC began criticizing him. According to Dr. Jane, two EPC members made comments that Dr. Jane was suffering from "cultural differences." Dr. Smith informed Dr. Jane that he needed to "act more like an Anglo–Saxon." [Jane Aff., Ex. 2]. Dr. Silvia made statements that Dr. Jane was having difficulty adjusting to the program because of his national origin. Dr. Jane recalls, "[Dr. Silvia stated that] basically because I was Hispanic, you know, I was the first person to come into the program of minority ethnicity in the Hispanic category ... that people were making— you know, thinking that I was— that I was having difficulties adjusting or that they also had problems adjusting to me, my culture, to my ethnicity, the way I expressed myself, things of that nature. It was about the way I am as a person." [Jane Aff., Ex. 2]. The EPC did not take any action against Dr. Jane at the meeting.

In May of 1995, after the meeting with the EPC, Dr. Jane received Dr. Kramer's second semester evaluation which summarized problems Dr. Jane had allegedly been having with tardiness, attendance, and relating to patients and staff. Dr. Kramer reported that the problems were "adequately addressed," presumably referring to the EPC's discussion with Dr. Jane at the EPC meeting. Dr. Kramer addressed other areas of concern but also made special note of Dr. Jane's accomplishments during the semester.

Dr. Jane's performance continued under scrutiny during his second year. On October 12, 1995, Dr. Jane received an Interim Clinical Performance evaluation from Dr. Kramer "due to significant concerns regarding [Dr. Jane's] lack of progress, questions of unprofessional behavior, and apparent lack of motivation to successfully complete the training program." [Jane Aff., Ex. 7]. The evaluation again identified Dr. Jane's lack of attendance at clinic sessions, conferences and appointments as continuing concerns. Dr. Kramer also cited a new concern involving a "potential dual relationship ... with a particular patient" which had apparently surfaced during the semester. [Jane Aff., Ex. 7]. According to documents provided by the Defendants which discuss the dual relationship more specifically, Dr. Kramer had received reports that Dr. Jane had been treating a personal friend who was also living with him temporarily during his treatment, resulting in the "dual relationship" and creating ethical concerns. [Jane Dep., Ex. 2 at 16]. Dr. Kramer stated in the evaluation that the concerns would be presented to the EPC on October 17, 1995, and that Dr. Jane could discuss the evaluation with his advisor, Dr. Peter Rosenquist, and bring his advisor to the EPC meeting. [Jane Aff., Ex. 7]. Dr. Jane did not sign the evaluation and instead wrote at the bottom, "I can not, and feel that I should not sign this document, because some of these allegations are incorrect." [Jane Aff., Ex. 7]. Dr. Jane still contends that the Defendants' allegations with respect to tardiness and attendance were false,[5] but the dual relationship is not discussed in either his deposition or in his affidavit.[6] The EPC held special meetings about Dr.

---

**5.** At his appeals hearing in June 1996, Dr. Jane conceded that he had problems with frequent absences but that these problems were resolved once the EPC put him on probation. According to documents submitted by Dr. Jane, Dr. Kramer's evaluation in the spring of 1996 states that these problems had resurfaced.

**6.** The information about the dual relationship is also contained in documents presented by the Defendants and the exhibits presented at Dr. Jane's deposition which he identified as the exhibits presented by him at his appeals hearing following the EPC's vote to dismiss him. Therefore, it seems undisputed that the

Jane's performance on October 17, 19, and 20, 1995, and on October 20 voted to place Dr. Jane on supervised probation for the remainder of his training. Dr. Jane was "shocked" that he was being put on probation because he did not recall having spoken with Dr. Kramer personally about any of the issues that led to the probation. Under the terms of his probation, the EPC gave Dr. Jane strict conditions in an effort to correct his problems. Among other things, Dr. Jane was to have monthly reviews, participate in mock board exams, and he was not to moonlight or participate in research outside his structured rotations during the term of probation. He was also required to complete a paper on "Why treating patients who are friends, family members, or business relations poses an ethical problem," and he was required to sign in and out of the clinics during his rotations. The EPC agreed that if any of the conditions of probation were not met or if there were any infractions, Dr. Jane would be dismissed from the program. Dr. Denton, who had supervised Dr. Jane on previous rotations, was assigned as probation supervisor.

Dr. Jane appealed the EPC decision to defendant Dr. Reifler, who upheld the probation. During probation, the EPC kept regular notes on Dr. Jane's status and Dr. Jane received progress reports from Dr. Kramer. On February 16, 1996, Dr. Kramer gave Dr. Jane an evaluation stating that "marked improvement was noted in all ... areas during the second half of the term." In March 1996, however, Dr. Thomas, the Clinical/Medical Director at Tri–County Mental Health Complex, completed a written evaluation for Dr. Jane concerning his rotation with her. Dr. Thomas gave Dr. Jane ones and twos in every area and in her written comments questioned Dr. Jane's psychiatric knowl-

edge, interviewing and diagnostic skills, record keeping and documentation. It was also noted that Dr. Jane's "abrupt manner" had prompted patient complaints. The evaluation was submitted to Dr. Kramer.

In April, Dr. Jane received an Interval Performance Review from Dr. Kramer covering the months of January through March, 1996. In the review, Dr. Kramer noted continued problems with tardiness and attendance at conferences. He also summarized the report from Dr. Thomas, adding, "[a]fter receiving feedback from your supervisors on these issues, you have made an effort to be more careful and cooperative. However, it remains unclear if you will satisfactorily complete this portion of your training requirement." [Jane Aff., Ex. 7]. Dr. Kramer also noted that Dr. Jane had received a "conditional pass" on his Mock Boards exercise, which was the minimal grade acceptable under Dr. Jane's probation terms. Finally, Dr. Kramer noted that the EPC had reviewed Dr. Jane's paper on dual relationships and said "the final product does not directly address the topic provided." [Jane Aff., Ex. 7]. In closing, Dr. Kramer issued what the EPC considered a "final warning" to Dr. Jane:

> In summary, you have made progress in several areas this quarter though several outstanding deficits remain. It is not at all clear if you will be able to successfully complete the program by June 30. I would suggest you work most prodigiously at completing all the aspects of your probation and place full effort in your psychotherapy training, elective rotation, and mental health center placement.

[Jane Aff., Ex. 7].

In late spring of 1996, Dr. Jane recalls sitting at the nurse's station in one of his

dual relationship was also an issue when Dr. Jane was put on probation.

rotations when Dr. Silvia approached him and said "Get out of the nurse's chair, you nigger." Dr. Jane does not specifically recall reporting this incident, but he thinks the incident occurred shortly after he contacted the office of Ala Jo Koonts, who is not a physician but holds an administrative office with The Medical Center, to complain that people in the department were discriminating against him. A woman named Sandy answered the telephone and offered to schedule a meeting, but the meeting was not scheduled before Dr. Jane was suspended from the program and ultimately never took place.

Dr. Jane states that he discussed his concerns about discrimination with "almost every attending [physician] I had there, supervisors, faculty advisors." Dr. Jane recalls a conversation in May of 1996 with Dr. Rosenquist and Dr. Vaughn McCall, his supervisor for an elective in Electro–Convulsive Therapy, where Dr. Rosenquist commented that "[Winston–Salem] was a 'Good Old Boys' Town," that I should rent a movie by the name of 'My Cousin Vinny' with Joe Pesci, because the same thing was happening to me; that I should fold while my cards were up, and [Dr. Rosenquist] told me to resign because, if not, they [would] put a black mark on my record and report me to a National Data Practitioner Base." [7]

On May 2, 1996, Dr. Jane's probation supervisor, Dr. Denton, submitted a report to Dr. Kramer concerning matters that were being brought to Dr. Denton's attention in his capacity as Dr. Jane's probation supervisor. Dr. Denton stated that a patient of Dr. Jane's had called the clinic that week requesting a refill of Prozac for her husband. The patient's chart revealed that the husband had not received a refill since August of 1995, but the wife insisted that Dr. Jane had continued refilling the medication by telephone. Dr. Denton wrote that he had asked Dr. Jane about the telephone call and Dr. Jane stated that the patient was no longer his patient. The pharmacy where the patient refilled his medication confirmed that refills had been called in by Dr. Jane. In conclusion, Dr. Denton states in his memo that "there is a problem here in that 1) the patient did not receive proper psychiatric follow-up and had prescriptions phoned in over about an 8 month period without being seen, 2) the refills are not documented in the chart so that documentation is inadequate, 3) Dr. Jane did not represent the facts to me in a truthful manner and a decision was made about the patient's care based on this misinformation." [Jane Dep., Ex. 2 at 31c].

The same day, as a result of Dr. Denton's memo, Dr. Kramer informed Dr. Jane in a memorandum that he would be suspended from the program immediately. In the memorandum, Dr. Kramer outlined the concerns in Dr. Denton's memorandum. As a result of these infractions, Dr. Kramer wrote that he would recommend Dr. Jane's termination from the program to the EPC effective May 31, 1996, and

7. Dr. Jane contends that his name was added to the National Practitioner Data Base when he was dismissed from the program. Defendants state that they are required by law to report any decision to involuntarily terminate a resident to the North Carolina Board of Medical Examiners, who then determines reportability to the National Practitioner Data Base. [Jane Dep., Ex. 4].

Dr. Jane's testimony regarding his conversations with the other residents in the program relates to their own belief that discrimination was occurring at The Medical Center. This testimony is inadmissible hearsay and, therefore, may not be considered in determining whether Dr. Jane's evidence would support a reasonable inference of discrimination sufficient to support a jury finding. In his deposition, Dr. Jane also recounted several conversations with other House Officers about the discrimination he was experiencing.

that Dr. Jane would have the right to defend the allegations at the EPC's regular meeting, which was to take place May 21, 1996. Dr. Kramer further stated the Dr. Jane could ask his faculty advisor to attend that EPC meeting and that the suspension decision could be appealed to Dr. Reifler as Department Chairman.[8]

Dr. Kramer spoke with Dr. Jane about his suspension May 3, 1996. Immediately after that, crucial faculty members, including Dr. Jane's advisor, left for a meeting in New York for a week, making it difficult for Dr. Jane to talk to anyone about his defense. The EPC met for the first time on May 10, 1996 to discuss and vote on Dr. Jane's suspension.[9] Four meetings of the EPC, with Dr. Jane present, occurred between May 10, 1996 and the evening of May 21, 1996. During these meetings, further allegations surfaced. Dr. Kramer reported that a patient, M.W., who was a known suicide risk, had repeatedly called the clinic in April asking to speak with Dr. Jane. Dr. Jane did not return several of her calls and the patient attempted suicide during that time period. Dr. Kramer reported that Dr. Jane had not documented his responses to her repeated telephone calls or his reasoning for deciding not to return those calls. When asked about the incident prior to the EPC meeting Dr. Jane said that the patient was calling during other scheduled appointments and that he had discussed setting limits and boundaries with her. Dr. Kramer reported to the EPC that this information, if true, was nonetheless not documented in patient's chart.

Dr. Kramer also noted that the patient who reported the refill authorizations which resulted in Dr. Jane's suspension had called patient relations because Dr. Jane had been repeatedly calling the patient's wife, accusing her of causing his suspension and recommending that the patient and his wife hire an attorney.

Dr. Jane was given the opportunity to defend the accusations during the EPC meetings and claims he rebutted 98 percent of the allegations against him, despite his continued feeling that he was given inadequate time to prepare. However, Dr. Jane's specific response to the refill allegation led the EPC to conduct some further investigation. Dr. Jane told the EPC that he had contacted the pharmacy where the patient refilled his Prozac prescription. Dr. Jane reported that the pharmacist had informed him that several of the refills were patient forgeries, and the pharmacist had contacted the police to report the forgeries. In an attempt to verify this information, an EPC member contacted the pharmacy and the pharmacist allegedly stated that his conclusion regarding the forgeries was based solely on Dr. Jane's statements that he had not called in the refills. The pharmacist had also not contacted the police, as Dr. Jane had reported to the EPC.[10] Upon this realization, the EPC met the evening of May 21 and decided by unanimous vote to adopt Dr. Kramer's termination recommendation and recommend to Dr. Reifler, the Chairman of the Department of Psychiatry, that Dr. Jane be terminated from the training program. The members present were Dr. Peters, Dr. Kramer, Dr. Silvia, Dr. Den-

---

**8.** Dr. Jane recalls receiving a memo from Dr. Kramer but does not recall specifically all of the allegations contained in it.

**9.** Dr. Jane indicates that the first meeting was moved up from May 21 to May 10, 1996.

**10.** At his appeals hearing, Dr. Jane stated that he had jumped to the conclusion that the refills were forgeries and that, upon further reflection, he realized he had authorized two of the refills. In his affidavit, Dr. Jane again states that he did not write the prescriptions.

ton, Dr. Smith, Dr. Brunsetter, and Dr. Seale. Five votes were required to pass the recommendation, and the recommendation passed 7–0. The recommendation was submitted to Dr. Reifler and approved by him effective May 31, 1996, one month prior to Dr. Jane's anticipated graduation. In their letter to Dr. Reifler recommending Dr. Jane's termination, the EPC cited their continued concern over several aspects of his performance and his competence, and specifically cited: 1) Dr. Jane's failure to maintain appropriate patient documentation, as evidenced by the calling in of multiple Prozac prescriptions for patient M.S. and the failure to document the prescriptions, as well as failure to document the phone calls of M.W., the suicidal patient, 2) Dr. Jane's failure to provide adequate continuity of care, as evidenced by Dr. Jane's failure to return the telephone calls of a suicidal patient; 3) Dr. Jane's misrepresentation of the facts surrounding the refill information; and 4) Dr. Jane's further inability to recognize the ethical problems with "dual relationships" as evidenced by Dr. Jane's telephone calls to M.S.'s wife regarding the allegations against him which resulted in a harassment complaint to patient relations about Dr. Jane.[11] [Jane Depo., Ex. 2 at 36a].

Section E of the "Policy Governing Employment of Physicians and Dentists Selected to Participate in the Internship and Residency Program at North Carolina Baptist Hospital" provides the procedure to be followed if a physician has been suspended or terminated from the program and requests a formal hearing. The policy was in effect in 1996 when Dr. Jane's hearing took place. The policy provides that a "House Officer who has been given notice of suspension, or notice of intent to terminate, and who has given written notice of appeal within seven days of the receipt of the notice … shall be entitled to a hearing before the Appeals Committee." [Pennell Aff.] The Appeals Committee consists of the Medical Members of the Executive Committee of the Chiefs of Professional Services. A House Officer can request a formal hearing, where each side may be represented by legal counsel.

The formal hearing mirrors a court hearing in the sense that the resident may call witnesses and cross examine the hospital's witnesses, may admit documents into evidence and may have a court reporter present. The Rules of Evidence do not apply. The findings of the Committee are based on the evidence and reduced to writing and delivered to the House Officer, Chiefs of Staff and "H.P."[12] The Appeals Committee decision is advisory unless the Chief of Staff's decision is determined to be arbitrary and capricious.[13]

11. According to documents submitted by the Defendants, the "dual relationship" issue concerning Dr. Jane's treatment of a friend was a major reason for Dr. Jane's initial probation, as evidenced in part by the fact that Dr. Jane was required to write a paper about dual relationships as a condition of probation. [Jane Depo., Ex. 2 at 20a]. The telephone calls to M.S.'s wife were allegedly another indication to the Committee that Dr. Jane did not understand the ethical concerns with dual relationships.

12. H.P. is not a defined term in the policy.

13. The policy attached to the memorandum presented to Dr. Jane regarding his dismissal came from the Residency Policy Manual, which contained a section on "Dismissal or discipline of resident and appeal process." [Br. in Opp'n to SJ, Ex. B]. The policy was created in 1988 and re-approved in 1995. While the Defendants indicate that this policy, which was also presented in Dr. Jane's material, was superseded by the policy described above, it seems that both policies were used. The 1988 policy seems to govern the initial decision to dismiss, while the policy discussed above seems to govern the appeals process once the dismissal decision has been made by

Dr. Jane appealed the termination recommendation to Dr. Reifler, but his appeal was denied. Dr. Reifler nonetheless allowed Dr. Jane a formal hearing before the Appeals Committee with his attorney, J. Griffin Morgan, present. The hearing was held on June 22, 1996 before the Medical Chiefs of Professional Services Executive Committee. Dr. Jane had never met any of the members of the Appeals Committee. At the hearing, Dr. Jane and his attorney did not allege that any discrimination had occurred against him. Dr. Jane says that discrimination was not discussed because he was advised by his attorney not to raise any allegations of discrimination. At the hearing, Dr. Jane was allowed to present evidence and witnesses and cross examine the witnesses presented by The Medical Center, but Dr. Jane maintains that despite the availability of the Appeals Hearing, he was still denied access to his medical charts.[14] At the conclusion of the hearing the Appeals Committee unanimously upheld the EPC's decision to terminate.

Dr. Jane contends that his probation and termination were a result of the Defendants' retaliatory action against him for exercising his free speech rights and a result of discrimination against Dr. Jane based upon his race, color, and national origin. Dr. Jane argues that he was the first Hispanic to be accepted into the residency program and that the Defendants treated him differently as a result.[15] Dr. Jane recalls the specific remarks attributed to Dr. Silvia, Dr. Smith and Dr. Peters relating to his race and national origin. Dr. Jane also recalls conversations with other House Officers and people throughout The Medical Center relating to their belief that discriminatory practices existed at The Medical Center.

Dr. Jane argues that Dr. Kramer specifically did not like him and was especially hard on him for infractions that were occurring throughout the residency program. Dr. Jane alleges that Dr. Kramer's evalua-

---

the EPC. The 1988 policy states that the EPC determines resident dismissal or discipline and a 2/3 vote of the full membership is required. Dismissal or discipline recommendations are made to the Chairman for final action. "In all cases, the resident is invited to meet with the committee to present his or her case before such a recommendation is in order. He or she may invite the faculty advisor to assist. The circumstances leading to the action will be explained in full to the resident by the committee or its representative at the time of action." [Br. in Opp'n to SJ, Ex. B]. The policy allows the resident to appeal to the Department Chairman with the help of the faculty advisor if desired. The appeal is final. The policy states as its objective "as equitable a hearing as possible" and notes that the faculty advisor serves as a potential advocate for the resident.

14. In his deposition, Dr. Jane stated that when he appeared at the June 26 hearing he had no understanding of what the hearing was about. When questioned about whether he knew it was a hearing where the Depart-

ment of Psychiatry would present its side of the case and Dr. Jane could present whatever he wished in response, Dr. Jane said he did not know what the hearing was about. Instead, he stated, he believed that the hearing was an opportunity for him to be humble and ask them not to terminate him from the program. However, at his deposition, Dr. Jane was able to identify the exhibits that were presented on his behalf at the hearing, which included his January–March of 1996 evaluations from his rotation supervisors for that term; his October–December of 1995 evaluations; EPC meeting minutes from March 1995–May 1996, documents regarding probation and termination which include photocopies from patients' charts, a copy of the telephone log relating to the telephone calls made by patient M.W., and Dr. Jane's resume.

15. Dr. Jane does not provide any evidence that he was the first Hispanic resident, aside from statements made to him, according to his own testimony, by other residents at the Medical Center. This is hearsay and will not be considered.

tions did not match the evaluations from supervisors who worked directly with him, that Dr. Kramer misrepresented the hours of credit Dr. Jane had received, and that he misrepresented the time Dr. Jane had accumulated for an elective in electroconvulsive therapy. Dr. Jane also alleges Dr. Kramer wrongly suggested Dr. Jane was tardy and unavailable for his patients, did not keep his charts up to date, did not properly follow his patients and wrote prescriptions without examining his patients.

Dr. Jane argues that he was treated differently and subjected to harsher disciplinary measures because of his race, color, and national origin. In addition to the comments made by supervisory physicians in the program about his race, color, and national origin, Dr. Jane points to the Defendants' less harsh treatment of other residents in the program who were white and had committed more serious infractions. According to Dr. Jane, a number of other students committed more egregious acts and were allowed to remain in the program.[16] In support of this contention, Dr. Jane provides two sets of minutes from EPC meetings, which document the semi-annual reviews for the residents.

Dr. Jane brought claims under 42 U.S.C. § 1983 alleging that, acting under color of law, Defendants deprived him of free speech, of equal protection, of privileges and immunities, and of due process; under 42 U.S.C. § 1981, alleging that Defendants deprived him of the benefits of his contract and discriminatorily deprived him of his right to make and enforce contracts; under Title VII of the Civil Rights Act (42

U.S.C. § 2000e–2), alleging that, in their treatment and dismissal of him, defendants intentionally discriminated against him because of his race, color, and national origin; under Title VI of the Civil Rights Act (42 U.S.C. § 2000d) alleging that Defendants receive federal financial and other assistance and their suspension and dismissal of him based on his race and color deprived him of rights and benefits secured by federal law and the federal Constitution; and under the North Carolina Equal Employment Opportunity Act, alleging that Defendant's conduct constituted a breach of contract and deprived him of rights secured by the laws of North Carolina.[17] The Defendants have moved for summary judgment as to all of Plaintiff's claims and their arguments are discussed below.

## II.

Summary judgment is only proper when, viewing the facts in the light most favorable to the non-moving party, there is no genuine issue of any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Cox v. County of Prince William,* 249 F.3d 295, 299 (4th Cir.2001). Summary judgment requires a determination of the sufficiency of the evidence, not a weighing of the evidence. *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine if a reasonable jury, based on the evidence, could find in favor of the non-moving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Cox,*

---

**16.** In his deposition, Dr. Jane lists students who were allegedly permitted to complete the program despite hardships and disciplinary problems. However, Dr. Jane's statements during his deposition were based only on what others told him. He has provided further documentation with his affidavit which is discussed later in this opinion.

**17.** Plaintiff initially also alleged that Defendants violated 42 U.S.C. § 1985 and § 1986, but he stated in his Response to Defendants' Motion for Summary Judgment that he will not pursue those claims. They are considered, therefore, to no longer exist.

249 F.3d at 299. The materiality of a fact depends on whether the existence of the fact could cause a jury to reach different outcomes. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Cox,* 249 F.3d at 299; *Solers, Inc. v. Hartford Cas., Ins. Co.,* 146 F.Supp.2d 785, 791 (E.D.Va.2001). The party opposing the motion may not rest upon its pleadings but must instead provide evidence or point to evidence already on the record that would be sufficient to support a jury verdict in its favor. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. This evidence must be properly authenticated pursuant to Rule 56(e). *Orsi v. Kirkwood,* 999 F.2d 86, 92 (4th Cir. 1993). The movant may be entitled to summary judgment merely by showing that the other side will not be able to prove an essential element of its case with respect to which it has the burden of proof. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2553.

## III.

Dr. Jane brought claims under 42 U.S.C. § 1983 alleging that Defendants, acting under color of state law, made adverse employment decisions in retaliation for Dr. Jane's exercise of his free speech rights.[18] Specifically, Dr. Jane alleges that the Defendants placed him on probation on October 20, 1995 in response to a letter he wrote to Dr. Kramer on September 15, 1995 about problems with one of his rotations. In the letter, Dr. Jane made observations about problems with the rotation and made suggestions for solving those problems. Dr. Jane contends Defendants later fired him because he complained to people in the department about discrimination he was experiencing. Dr. Jane also brought an action under § 1983 alleging that Defendants, under color of law, deprived him of privileges and immunities,[19] equal protection under the law, and due process because they fired him on the basis of his race, color and national origin.

Defendants argue that all claims under 42 U.S.C. § 1983 should be dismissed because Wake Forest University is not a public university and North Carolina Baptist Hospital is not a governmental hospital. Plaintiff disagrees, stating:

Defendants are part of a private university but they provide health services and training for the state and its citizens. They receive substantial federal funds and services from the state and the fed-

---

**18.** 42 U.S.C. § 1983 provides, in relevant part:

[E]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983.

**19.** Plaintiff's allegation that the Defendants deprived him of privileges and immunities seems to serve no purpose here. 42 U.S.C. § 1983 states that a person acting under color of law who deprives a citizen of rights, privileges or immunities secured by the Constitution and laws shall be liable. Plaintiff asserts that his First Amendment rights and civil rights have been violated. A cause of action under 42 U.S.C. § 1983 for a violation of the Privileges and Immunities Clause of the Constitution has been recognized by the Fourth Circuit, but that cause of action relates to insuring "to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy." *O'Reilly v. Board of Appeals for Montgomery Cty.,* 942 F.2d 281, 284 (4th Cir.1991) (citing *Toomer v. Witsell,* 334 U.S. 385, 395, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948)). Dr. Jane does not allege that he was a citizen of another state. Regardless of Plaintiff's intent in bringing such a claim, however, it does not survive because no state action is present.

eral government. The federal and state governments are extensively involved in the supervision and monitoring of defendants' operation. Therefore, by statute and the U.S. Constitution, defendants are required to accord to plaintiff due process and equal protection of the law. [Br. in Opp'n to SJ, at 6].

Dr. Jane provides no evidence, other than the above statement, to support his contention that Wake Forest University and its hospital system should be treated as public actors. The Fourth Circuit made it clear in *Modaber v. Culpeper Memorial Hospital*, 674 F.2d 1023 (4th Cir.1982) that establishing "state action" in the case of a private hospital requires more than a mere showing that the hospital receives state and federal funding. *Modaber*, 674 F.2d at 1027 ("The staff privileges decisions of a hospital which receives Hill–Burton Funds, accepts Medicare and Medicaid patients and reports privileges revocations to the state medical licensing authority do not constitute 'state action.' [S]tate action is

an essential prerequisite to obtaining relief under 42 U.S.C. § 1983 . . . ."). Given that the Plaintiff in this case has not provided any evidence even to support his contention that the hospital receives public funding, he has fallen far short of the showing required to establish state action when a private hospital is the Defendant. Therefore, all of Dr. Jane's § 1983 claims, which require a defendant to act under color of state law, must fail.

## IV.

Dr. Jane claims Defendants violated Title VI and Title VII of the Civil Rights Act and 42 U.S.C. § 1981 by discriminating against him on the basis of his race, color, and national origin when they placed him on supervised probation, suspended him, and terminated him.[20] Causes of action for discrimination under Title VI and Title VII of the Civil Rights Act and 42 U.S.C. § 1981 are all appropriately analyzed under the elements of a Title VII claim.[21] Because Dr. Jane alleg-

---

**20.** Title VI provides that "no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d (West 1994).

Title VII provides:

It shall be an unlawful employment practice for an employer . . . (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2 (West 1994 & Supp. 2000).

42 U.S.C. § 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981 (West 1994).

**21.** Title VI is appropriately analyzed under Title VII: *Guardians Assoc. v. Civil Serv. Comm. of City of N.Y.*, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (Marshall, J. dissenting) (noting that to make out Title VI claim one must analyze the proof elements of Title VII); *Escobar v. Montgomery County Bd. of Ed.*, No. AW–99–1964, 2001 WL 98600, *5, 2001 U.S. Dist. LEXIS 1069 at *17 (D.Md. Feb.1, 2001) ("Courts commonly use the Title VII discrimination proof scheme to evaluate claims for intentional discrimination under Title VI."); *Middlebrooks v. Univ. of Mary-*

es discrimination in both his discipline and his ultimate termination, his claims will be analyzed under a Title VII framework for both discriminatory discharge and disparate discipline. These claims are addressed in turn.[22]

Under a Title VII claim for discriminatory discharge, a plaintiff may provide direct evidence of discrimination, such as "conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision," or, in the absence of such direct evidence, the plaintiff may proceed using circumstantial evidence under the burden-shifting proof scheme established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Taylor v. Virginia Union University*, 193 F.3d 219, 232 (4th Cir.1999). Dr. Jane alleges that he has sufficient direct evidence in the form of discriminatory comments made to him by his supervisors and because similarly situated white residents were treated more favorably.[23]

*land*, No. 9702473, 1999 U.S.App. LEXIS 305 (4th Cir. Jan. 11, 1999) (unpublished opinion) ("Thus, to evaluate the appropriateness of summary judgment, the Court must evaluate the elements of Appellant's Title IX, Title VI, 1981 and 1983 claims"); *Love v. Duke Univ.*, 776 F.Supp. 1070 (M.D.N.C.1991) ("In order to make out a prima facie case of discrimination under Title VI, it is necessary to analyze the proof elements of Title VII.").

42 U.S.C. § 1981 is appropriately analyzed under Title VII: *Burwell v. Philip Morris*, No. 94–1519, 1994 WL 702108, *2, 1994 U.S.App. LEXIS 35247 at *7 (December 15, 1994) (unpublished) ("The requirements for a plaintiff's prima facie case under Title VII and 1981 are the same . . . ."); *Stephens v. South Atl. Canners, Inc.*, 848 F.2d 484 (4th Cir.1988) (acknowledging that § 1981 and Title VII require proof of similar elements to establish a prima facie case); *Abasiekong v. City of Shelby*, 744 F.2d 1055 (4th Cir.1984) (analyzing 42 U.S.C. § 1981 under *McDonnell Douglas*).

Under Title VI, a showing of discriminatory intent is not required as long as a plaintiff is seeking injunctive and not monetary relief. Dr. Jane seeks monetary relief under his Title VI claims and thus must show intentional discrimination. *See Guardians Assoc. et al. v. Civil Service Comm'n of the City of New York*, 463 U.S. 582, 584, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983); *Escobar v. Montgomery County Bd. of Ed.*, 2001 WL 98600, 2001 U.S. Dist. LEXIS 1069 (D.Md. Feb. 1, 2001) ("Courts have applied a disparate impact analysis to cases brought under Title VI where injunctive or declaratory relief was requested. (Citations omitted). However, where compensatory relief is sought, intentional discrimination must be proven.")

22. Although Dr. Jane was dismissed from an academic institution, discrimination alleged in the context of academic dismissals have typically been evaluated under the same framework as discrimination in the workplace. *Epstein v. Loyola Univ. Med. Ctr.*, No. 99–3690, 2000 WL 1277625, 2000 U.S.App. LEXIS 22732 (7th Cir. Sept. 7, 2000) (unpublished opinion) (alleging discrimination in residency program); *Carter v. St. Louis Univ.*, 167 F.3d 398 (8th Cir.1999) (alleging discrimination in residency program); *Middlebrooks v. Univ. of Maryland*, No. 9702473, 1999 WL 7860, 1999 U.S.App. LEXIS 305 (4th Cir. 1999) (unpublished opinion) (alleging discrimination in student's dismissal from Ph.D. program); *Escobar*, 2001 WL 98600, 2001 U.S. Dist. LEXIS at 1069 (alleging discrimination in Plaintiff's discipline in primary school setting); *Zaklama v. Mt. Sinai Med. Ctr.*, 842 F.2d 291 (11th Cir.1988) (alleging discrimination in residency program); *Love*, 776 F.Supp. at 1070 (alleging discrimination in Plaintiff's dismissal from Doctoral Studies program in biochemistry).

23. Dr. Jane's brief does not call this evidence "direct evidence," but he discusses this evidence in a section of his brief which is separate from his analysis under *McDonnell Douglas*. Furthermore, it is appropriate for a District Court to analyze all of the evidence to determine if the Plaintiff is entitled to the mixed-motive standard used for direct evidence. *Fuller v. Phipps*, 67 F.3d 1137 (4th Cir.1995) ("A plaintiff need not decide at the outset whether to classify his case as a 'pretext' or a 'mixed motive' case. Instead, the district judge makes this determination after evaluating the evidence.").

However, none of the evidence provided by Dr. Jane "reflect[s] directly the alleged discriminatory attitude" with respect to the Defendants in this lawsuit *and* "bear[s] directly on the contested employment decision." *Id.* at 230.

■ First, Dr. Jane alleges in his brief and affidavit that he was the first Hispanic in the Defendants' residency program. As noted above, Dr. Jane provides no evidence of this fact and therefore it cannot be used. Second, Dr. Jane argues that the remarks made by Drs. Peters, Smith, Silvia, McCall, and Rosenquist are direct evidence of discrimination.[24] "[T]o prove discriminatory animus, the derogatory remark cannot be stray or isolated[,] and unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of discrimination." *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir.1999). In this case, the remarks were stray and isolated, were varying in their severity and in the way they might have been understood by Dr. Jane, and were not related to the employment decision in question.

Dr. Jane interprets Dr. Peters' remark on his evaluation in the fall of 1994, that Dr. Jane's "interpersonal rubs" with staff were perhaps "partly a language based phenomena" as a derogatory comment about Dr. Jane's national origin. However, in the context in which it was made, such an interpretation could not reasonably be perceived as derogatory. Dr. Peters had supported Dr. Jane's admission to the program in April of 1994, five months before the evaluation. Numerically, Dr. Peters gave Dr. Jane three's and four's in every category on his evaluation, the highest marks a student can make. In fact,

Dr. Peters gave Dr. Jane one of the best evaluations he received during his entire residency, and his comment about Dr. Jane's national origin seems to excuse these observed "interpersonal rubs" with staff members by suggesting to Dr. Jane that they "may be partly a language/expression based phenomena." That "interpersonal rubs" seemed to exist allowed Dr. Peters the opportunity to either be hard on Dr. Jane for causing the problem or provide a non-blameworthy explanation for the problem. Dr. Peters chose the more forgiving option. Furthermore, Dr. Jane has made no showing, nor even suggested, that the comment is related to his probation, suspension, or termination. In fact, the very same evaluation is included in the documents Dr. Jane submitted in support of his response to the Defendants' motion for summary judgment, to support that he "made sturdy improvements and received satisfactory and above evaluations …." [Jane Aff. at 2]. Later during his first year, Dr. Peters allegedly again speculated to Dr. Jane that his difficulty in communicating with others was perhaps attributable to Dr. Jane's inability to capture the meaning of Spanish words in the English translation. Again, this comment is not discriminatory on its face and Dr. Jane provides no evidence indicating that the comment had any bearing on the decisions made by the EPC or anyone else concerning Dr. Jane's probation, suspension or dismissal.

Dr. Silvia and Dr. Smith's comments at the EPC meeting in May of 1995 about Dr. Jane's "cultural differences" and the theory that people in the program were having difficulties adjusting to him are also consistent with the EPC's efforts to help Dr. Jane correct early problems. While the

---

**24.** Dr. Jane does not direcly point to the comments made by Drs. McCall and Rosenquist, but he includes the comments in his deposition excerpts which are generally cited to support Dr. Jane's general contention that his dismissal was a result of discrimination.

words allegedly used by Drs. Silvia and Smith were not well chosen, the remarks, again, had no bearing on the employment decision. Drs. Silvia and Smith were members of the EPC, but the meeting at which the comments were allegedly made resulted in no action against Dr. Jane. The EPC did not vote on any disciplinary action at that time. Furthermore, the comments were made in May of 1995, shortly after Dr. Jane's contract was renewed in April for a second year in the program, five months before the committee voted in October to place Dr. Jane on probation, and one year before Dr. Kramer recommended Dr. Jane's suspension the following May. Dr. Jane provides no evidence that the EPC's decision to place him on probation in October of 1995 was related to the comments made by Dr. Silvia and Dr. Peters in May of 1995. Instead, Dr. Jane states in his affidavit submitted to the Court that the EPC's probation decision was based on Dr. Kramer's "false" accusations that he was "tardy and late." Dr. Jane also provides no evidence that these comments by Drs. Silvia and Smith affected his dismissal.

Dr. Jane also points to Dr. Silvia's comment, to "get out of the nurse's chair, you nigger" allegedly made late in the second year. Although Dr. Silvia is a member of the EPC, Dr. Jane has not shown that the EPC was aware that Dr. Silvia had made that comment to Dr. Jane or that the comment was relied upon when the Committee decided to place Dr. Jane on probation, Dr. Kramer's decision to suspend Dr. Jane, or the Committee's decision to dismiss Dr. Jane from the program. In fact, during his deposition, Dr. Jane could not recall whether he reported the specific comment to anyone. Furthermore, even if Dr. Silvia's personal beliefs influenced her own vote, the disciplinary decisions made by the EPC required a vote by two-thirds of the Committee. In both cases, the votes against Dr. Jane were unanimous, and Dr. Silvia's vote alone was not required to create the two thirds necessary to place Dr. Jane on probation or to dismiss him.

Finally, the remarks made by Drs. McCall and Rosenquist are also stray and isolated, and Dr. Jane states that Dr. McCall's evaluations of Dr. Jane were good. Dr. Rosenquist was Dr. Jane's faculty advisor. In fact, Dr. Jane does not allege that these remarks were discriminatory; instead, he seems to allege that Dr. McCall and Rosenquist were telling Dr. Jane about a conspiracy among faculty to force Dr. Jane to resign. However, Dr. Jane provides no evidence in the form of affidavits from these individuals about these statements, and the statements otherwise serve no evidentiary purpose.

Even if all of these comments somehow played a role in the EPC's decision to place Dr. Jane on probation in October of 1995 or to terminate Dr. Jane in May of 1996, there is still no evidence that Dr. Reifler knew of the comments or was influenced by them when he denied Dr. Jane's appeal of both actions, or that the views of Dr. Silvia and Dr. Smith influenced Dr. Kramer's decision to suspend Dr. Jane from the program in May of 1996 and recommend his termination, the EPC's adoption of Dr. Kramer's recommendation, or the Appeals Committee's decision to uphold Dr. Jane's termination.

Finally, Dr. Jane contends that he has evidence showing he was treated differently from white students who had committed the same or more serious infractions and that this is direct evidence of discrimination. Dr. Jane's evidence consists of two sets of minutes from EPC meetings, which appear to report on the progress of certain residents under observation because of prior difficulties. These documents do not

provide any information about the nature of the students' initial difficulties, a history of the disciplinary action taken against these students, and do not indicate whether the students were permitted to complete the program. The documents do not even provide enough information to determine whether the students were non-Hispanic. Therefore, they are not sufficient to show any evidence, direct or indirect, of discrimination, because they lack probative value of any kind.

Because Dr. Jane does not have sufficient direct evidence of discrimination, his case for discriminatory discharge must be analyzed under *McDonnell Douglas* for the claims under Title VI, Title VII, and 42 U.S.C. § 1981. Under *McDonnell Douglas*, a plaintiff's prima facie case of discrimination creates an inference that the employment action was based on unlawful discrimination. If the plaintiff can establish a prima facie case, the employer must then give a legitimate, nondiscriminatory reason for its action in order to rebut that inference. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 678. If the employer presents such a reason, the plaintiff can still prove discrimination by showing that the stated reason is a mere pretext for a decision motivated by discrimination. *Reeves v. Sanderson*, 530 U.S. 133, 143, 120 S.Ct. 2097, 2107, 147 L.Ed.2d 105 (2000); *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825, 36 L.Ed.2d at 679.

To establish a prima facie case of discrimination in the context of discriminatory discharge, Dr. Jane must show: 1) He is a member of a protected class; 2) he

suffered an adverse employment action; 3) at the time of the adverse employment action, he was performing at a level that met the Defendants' legitimate job expectations; and 4) the position was filled by a similarly qualified applicant outside the protected class. *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 607 (4th Cir. 1999). Other circumstances giving rise to an inference of unlawful discrimination may also be used to satisfy the fourth prong. *E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 851 n. 2 (4th Cir.2001) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Because of the unique circumstances of Dr. Jane's employment, in that he was both a student for purposes of his psychiatry training and was functioning as a hired employee of the hospital, the fourth prong typically used in discriminatory discharge is misplaced in this context because, in dismissing Dr. Jane, the defendants did not seek a replacement. Dr. Jane was simply not permitted to complete the program. Therefore, Dr. Jane may provide evidence of other circumstances giving rise to an inference of unlawful discrimination to satisfy the fourth prong.[25]

 While "[t]he burden of establishing a prima facie case of disparate treatment is not onerous," *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959–60 (4th Cir.1996) (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)), it is not at all clear in this case that Dr. Jane has even established a prima facie case.

---

25. In *McDonnell Douglas*, the Supreme Court recognized that the facts of different cases would vary and the prima facie case provided would not be applicable in all situations. The Fourth Circuit has recognized that "[w]hat is critical with respect to the fourth element is that the plaintiff demonstrate that he was not hired (or [that he was] fired or not promoted, etc.) 'under circumstances that give rise to an inference of unlawful discrimination.'" *Sears Roebuck & Co.*, 243 F.3d at 851 (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

Dr. Jane argues that there is a genuine issue of material fact as to whether he was performing the job successfully, and that this factual dispute "clearly demonstrates the inappropriateness of summary judgment." [Pl. Memorandum in Opp. to SJ, p. 5]. However, under the *McDonnell Douglas* framework, summary judgment in favor of the Defendants will still be appropriate if Dr. Jane is unable to put forth sufficient evidence to show that the legitimate, nondiscriminatory reason for his discharge proffered by the Defendants is pretextual.[26]

Dr. Jane alleges that a genuine issue of material fact exists concerning the third prong of the prima facie case because he contends that he was performing at a level that met the Defendants' legitimate expectations. As evidence that his performance was satisfactory, Dr. Jane provides evaluations, letters of recommendation written in August of 1995 by Drs. Reifler, McCall, Denton, and Kramer to various geriatric fellowship programs on behalf of Dr. Jane, and graphs of Dr. Jane's evaluations. While the letters and evaluations suggest that Dr. Jane was, at times, meeting the expectations of the Defendants, the written comments from supervisors reveal several of the issues cited by the Defendants as their initial reason for placing him on probation in October of 1995. The Defendants were initially concerned about tardiness and absenteeism, both of which are discussed in the evaluations presented by Dr. Jane and the very reason Dr. Jane describes as "false" for placing him on probation in October of 1995. Dr. Jane's recommendations and evaluations were mixed, and his performance level as a student in the program in some areas of psychiatry was clearly satisfactory at times. Dr. Jane argues that there is a genuine issue of material fact concerning his performance and a jury should determine whether he was meeting the Defendants' expectations.[27] However, the close call that would have to be made to determine whether he was meeting the Defendants' expectations need not be made in this case. Summary judgment remains appropriate even if a plaintiff has fully established a prima facie case as long as the defendant puts forth a legitimate reason for the termination and the plaintiff is unable to show pretext. *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993). Therefore, even if Dr. Jane established his prima facie case, he would still be required to show pretext. As discussed below, even if Dr. Jane could definitively

**26.** The Fourth Circuit has upheld district court dispositions of discrimination cases. *See, e.g. Edwards v. Norfolk S. Corp.*, 872 F.Supp. 277, 280 (W.D.Va.1994), *aff'd*, 42 F.3d 1385, 1994. WL 681097 (4th Cir.1994) (upholding district court, which stated, "[s]ummary judgment is not inappropriate in age and gender discrimination cases merely because they involve issues of intent and motive" and that "even establishment of a prima facie case does not mean the case must be submitted to the jury or that summary judgment is improper"). At a minimum, proof of pretext is required for a Plaintiff to survive summary judgment. *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir.1993).

**27.** Defendants submitted numerous cases stating that it is not the Court's place to second-guess academic decisions. *See, e.g. Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985); *Board of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978); *Henson v. Honor Comm. of Univ. of Va.*, 719 F.2d 69 (4th Cir.1983). However, these cases all arose in the context of due process complaints, which are not at issue here because Baptist Hospital and Wake Forest University Medical Center are not state actors. Here, the Court is not being asked to evaluate standards but to determine whether a medical school/hospital deviated from its standard in dismissing a student/employee as a pretext to conceal discrimination.

show that he was meeting the minimal requirements of the program, he has not provided sufficient evidence that the Defendants' nondiscriminatory reason for terminating him from their program was mere pretext for discrimination.

In providing a legitimate, nondiscriminatory reason for a plaintiff's termination, the Defendants' burden is of production, not persuasion. *Causey v. Balog*, 162 F.3d 795, 800 (4th Cir.1998); *E.E.O.C. v. Clay Printing Co.*, 955 F.2d 936, 941 (4th Cir. 1992). As outlined in their letter of dismissal and in the affidavits provided by Dr. Peters and Dr. Kramer, Defendants terminated Dr. Jane because he failed to comply with the requirements of his probation, and because of deficiencies which surfaced in the spring of 1996 that led Defendants to conclude that Dr. Jane was a danger to his patients. In support of their argument that Dr. Jane was not meeting the legitimate expectations of the program, Defendants submitted all of the documentation they produced about Dr. Jane during his residency, including evaluations of Dr. Jane from all of his rotation supervisors, internal memos concerning Dr. Jane's performance, memos to Dr. Jane concerning his performance, probation, suspension and termination, minutes from all EPC meetings relating to Dr. Jane's performance, and the transcript from Dr. Jane's appeals hearing in front of the Medical Chiefs following his termination, when Dr. Jane was represented by counsel. Defendants also submitted Dr. Jane's deposition testimony and the affidavits of Drs. Kramer, Reifler, Pennell and Peters. All of these documents were submitted in support of the Defendants' contention that Dr. Jane's failure to perform adequately and the danger posed to patients as a consequence of his deficiencies were the reasons for terminating him. Defendants have produced sufficient documentation supporting their reasons for ter-

minating Dr. Jane to meet their burden of production.

As Defendants have produced a legitimate, nondiscriminatory reason for dismissing Dr. Jane from the residency program, Dr. Jane must show "by a preponderance of the evidence that the legitimate reasons offered by the [D]efendant[s] were not their true reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 143, 120 S.Ct. at 2110, 147 L.Ed.2d at 107. The plaintiff bears the burden of proving the falsity of the defendant's explanation. A plaintiff can prove this directly or he can make his case "if the trier of fact can reasonably infer from both the plaintiff's prima facie case and with the defendant's false explanation that the defendant is attempting to conceal discrimination." *Id.* Within this framework, the court can draw inferences from the strength of a plaintiff's prima facie case and the defendant's weak explanation in order to find pretext. *Id.*

As discussed below, the evidence provided by Dr. Jane is not sufficient to create a reasonable inference that the reason proffered by the Defendants is not the true reason for his dismissal. Absent this showing, Dr. Jane's claims for discriminatory discharge under Title VI, Title VII, and 18 U.S.C. § 1983 cannot survive summary judgment. Dr. Jane provides his own affidavit to support his contention that the Defendants' reasons for terminating him were false. The affidavit provides Dr. Jane's perspective concerning matters related to his dismissal and includes supporting documents.

Dr. Jane alleges that Dr. Kramer was personally never happy with his performance in the program and that he provided adverse evaluations that did not support the evaluations by Dr. Jane's direct

supervisors. Dr. Jane provides no documents to support this statement. A review of documents furnished by Dr. Jane—Dr. Kramer's Clinical Performance Reviews and Interim Evaluations, as well as the evaluations of Dr. Jane's direct supervisors—reveal few, if any, inconsistencies. Furthermore, Dr. Jane's argument suggests that Dr. Kramer's performance evaluations should come strictly from the written evaluations provided by the direct supervisors of the rotations. However, it is clear in Dr. Kramer's evaluations and affidavit that his evaluations are based on more than just the written evaluations from supervisors. Dr. Kramers' evaluations allude to discussions with supervisors outside the written evaluation. Dr. Jane alleges that Dr. Kramer gave Dr. Jane written evaluations "without personal knowledge," but has provided no evidence that this way of evaluating students is unacceptable or that the conversations were not accurately reported by Dr. Kramer. Dr. Kramer is the head of the psychiatric residency program, and he must rely on the supervision of others to produce his reports. Dr. Jane provides no evidence that his performance evaluations by Dr. Kramer are atypical for a resident in any respect.

Dr. Jane also states that Dr. Kramer misrepresented psychotherapy credits he had accumulated. Dr. Jane needed 300 psychotherapy hours to graduate and had accumulated 235 hours by April of 1996. Prior to probation, Dr. Jane had accumulated 100 psychotherapy hours. Dr. Jane submitted Dr. Kramer's deposition and EPC meeting minutes. Nothing in these documents suggests Dr. Kramer misrepresented the number of hours Dr. Jane accumulated. In fact, the EPC minutes provided by Dr. Jane dated April 23, 1996 state that "Dr. Jane currently has 135 reported psychotherapy hours *since beginning probation.*" Furthermore, the minutes suggest that the EPC was concerned with number and quality of hours. Dr. Jane has also not shown that the number of psychotherapy hours he had or had not accumulated was significantly related to his termination. Dr. Kramer cited the psychotherapy hours as a concern for the EPC, but this was clearly not their only concern with respect to Dr. Jane. In fact, the number of hours Dr. Jane had or had not completed was not even cited by the EPC in their dismissal letter.

Dr. Jane also alleges that Dr. Kramer misrepresented the number of hours he had accumulated in Electro–Convulsive–Therapy (ECT) Training, an elective course required for graduation.[28] Dr. Jane presents a letter written by Dr. Kramer after Dr. Jane's dismissal which summarizes the training Dr. Jane received while at The Medical Center. The letter does not include the ECT training that Dr. Jane had received. Dr. Jane also submits his certificate of training with a short letter from his supervisor stating that he did complete the training. Since Dr. Kramer's letter was written after Dr. Jane had already been terminated from the program, it is void of any evidentiary value. Dr. Jane cannot show that Dr. Kramer's failure to cite ECT hours in a post-dismissal letter related at all to the Defendants' termination of him from the program.[29]

---

**28.** Dr. Jane states in his affidavit that he was "scheduled to receive honors" in his ECT training. However, Dr. McCall, his ECT supervisor, wrote on Dr. Jane's evaluation (submitted to the Court by Dr. Jane) that "I am not crediting [Dr. Jane] with 'honors' level performance because on one or two occasions he has been late or missed conferences." [Jane Aff., Ex. 4].

**29.** Dr. Jane also submits a letter from Dr. Haberkorn written December 10, 1996. However, Dr. Jane provides nothing to validate its authenticity. A party opposing a

Dr. Jane further alleges that Dr. Kramer falsely accused him of being tardy and unavailable for his patients. [Jane Aff. at 3]. Dr. Jane submits the evaluation issued by Dr. Kramer from July–September of 1995 to support his contention that the allegations are false. However, this document also provides no evidentiary support for Dr. Jane's contention. It appears that Dr. Jane considers his refusal to sign the evaluation as evidence that the allegations are false. The signature line reads: "I can not, and feel that I should not, sign this document, because some of the allegations are incorrect." [Jane Aff., Ex. 7]. Aside from the fact that Dr. Jane uses his own statement as evidence that the underlying accusations are false, Dr. Jane does not identify which of the several allegations are incorrect. Moreover, there is evidence in the record that Dr. Jane acknowledged the allegations when he was told he would be placed on probation. In his response to the allegations put forth by the EPC, Dr. Jane states: "Assuming that the unprofessional conduct is regarding my punctuality and absences from OPD conferences, I accept full responsibility and this will be corrected immediately." [Jane Dep., Ex. 2 at 17d].

As noted above, Dr. Jane's recitation of comments made during his residency are also not sufficient to create an inference of discrimination, particularly in light of the lack any accompanying evidence from Dr. Jane. Therefore, the comments are not sufficient, alone or with the other documents provided by Dr. Jane, to show pretext.

To establish pretext, a court may draw inferences from the strength of a plaintiff's prima facie case and a showing that the defendant's proffered reason for the ad-

verse employment action is false. *Reeves*, 530 U.S. at 143, 120 S.Ct. at 2110, 147 L.Ed.2d at 107. However, the ultimate burden remains on the plaintiff to prove that the employer's explanation is false. *Id.* Dr. Jane is unable to meet that burden. In fact, the entire record shows that Dr. Jane had three opportunities—in his testimony to the Appeals Committee during the appeals process, in his deposition taken in March of 2002, and in his affidavit provided to the Court in conjunction with his response to the Defendants' motions—to discuss the major allegations resulting in his dismissal: that he continued to fail to meet all of the conditions of probation, failed to maintain appropriate documentation in patient charts, failed to provide adequate continuity of care (as evidenced by Dr. Jane's failure to return the telephone calls of a suicidal patient); misrepresented the facts surrounding the refill information; and failed to recognize the ethical problems with "dual relationships" (as evidenced by his phone calls to M.S.'s wife). He has come forward with no evidence, then or now, to create a reasonable inference that he did not do those things enumerated or that, if he did, they were not the basis for his dismissal.

In his affidavit, Dr. Jane contends that he did not fail to provide documentation in patient charts. To support this, Dr. Jane provides evaluations from three of his rotation supervisors, Dr. Denton, Dr. Thurber, and Dr. Haberkern. Dr. Denton's evaluation contained the sentence "Records examined were in good shape," and was written in the summer and fall of 1995, before the spring of 1996 incidents which allegedly led to his dismissal. Dr. Haberkern's evaluations, while positive, do not mention anything about documentation

---

motion for summary judgment must provide evidence that has been properly authenticated pursuant to Rule 56(e). *Orsi*, 999 F.2d at 92

(4th Cir.1993). Therefore, the letter cannot be considered at all.

and Dr. Haberkern's last evaluation was written for the October to December of 1995 time period. Dr. Thurber's evaluations are positive through spring of 1996, but do not specifically address the documented concerns raised by the EPC. Moreover, Dr. Jane's affidavit does not discuss or explain an evaluation provided by Dr. Absher in the fall of 1995 in which states "[Dr. Jane] kept his own notes, so there was nothing to look at in the patients' chart when issues came up before his dictation could be typed." In summary, Dr. Jane's evidence as presented through his affidavit does not specifically address the EPC's allegations about Dr. Jane's failure to document patient refills or the telephone calls of a suicidal patient.

With respect to the allegation that Dr. Jane refilled prescriptions for patient M.S. without documenting them in the chart, Dr. Jane states that Dr. Denton "wrote the prescription" and provides a pharmacy printout with handwritten notations that say "forgery" on four of the refills with Dr. Jane's name on them. [Jane Aff. at 3]. Dr. Jane does not further identify the document or discuss what he means by the statement that Dr. Denton wrote the prescription. In sum, Dr. Jane's statement sheds no light on the truth or falsity of the Defendants' contention that he was providing refills and not documenting them in the chart.[30]

Dr. Jane does not refute or discuss at all the allegation that he failed to document his responses to M.W.'s repeated telephone calls or his reasoning for deciding not to return those calls. Dr. Jane also does not discuss the alleged harassing phone calls made to patient M.S. and his wife concerning the refill incidents.

Dr. Jane attempts to provide a blanket response to his dismissal through his deposition, where he repeats conversations that he had with fellow residents concerning their belief that discrimination took place at the medical school. However, Dr. Jane does not provide affidavits from any of these residents and relies only on his own testimony concerning their personal belief that discrimination took place at the medical school. This is hearsay and inadmissible. It also does not provide any evidence to refute the non-discriminatory reason for his dismissal.

Given that Dr. Jane has not provided sufficient direct or circumstantial evidence that the Defendants discriminated against him when they terminated him from the program, his claim for discriminatory discharge must fail.

Since Dr. Jane provides the same evidence discussed above for his disparate treatment claim, this claim must also fail. As discussed above, Dr. Jane does not provide sufficient direct evidence of disparate treatment to proceed based on direct evidence. Therefore, Dr. Jane's disparate discipline claim would also be analyzed under the *McDonnell Douglas* framework. To establish a prima facie case of disparate

**30.** Moreover, throughout the record, Dr. Jane's response to the refill allegation has been inconsistent. At the initial hearing before the EPC, Dr. Jane vehemently denied the charges, contacted the pharmacy, and brought in the pharmacy printout indicating that the other refills were forgeries. When Dr. Jane testified at his hearing before the Appeals Committee, after the EPC voted unanimously to dismiss him, Dr. Jane concluded that "out of the two refills, two of them I did not document refills that were mine that I went ahead and—- it was a mistake. I should have documented now that I reflect back ... now that I look back, I made a mistake." In his deposition testimony, Dr. Jane again alleges that the refill call-ins were forgeries. In his affidavit, he discusses only the refill allegedly called in by Dr. Denton. These conflicting accounts in the record dilute Dr. Jane's statement in his affidavit that the allegations were false.

discipline, a plaintiff must show: "(1) that he is a member of the class protected by Title VII, (2) that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class, and (3) that the disciplinary measures enforced against him were more severe than those enforced against those other employees." *Cook v. CSX Transportation Corporation*, 988 F.2d 507, 511 (4th Cir.1993) (citing *Moore v. City of Charlotte*, 754 F.2d 1100 (4th Cir.), *cert. denied*, 472 U.S. 1021, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985)); *Worster v. U.S. Postal Service*, 132 F.Supp.2d 397 (M.D.N.C.2001). Since Dr. Jane has produced no evidence that the prohibited conduct in which he engaged was comparable or that he was treated differently from other white residents in the program, he does not have a prima facie case for disparate discipline. Furthermore, as discussed above, Dr. Jane provides no evidence to refute the Defendants' reasons for placing him on probation or suspending him prior to his dismissal. Therefore, Dr. Jane's disparate discipline claim must also fail.

## V.

██ Dr. Jane also brought a claim against Defendants for wrongful discharge under the North Carolina Equal Employment Opportunity Act. N.C. Gen.Stat. § 143–422.2. When analyzing claims under § 143–422.2, North Carolina follows the evidentiary standards used in Title VII cases. *Hughes v. Bedsole*, 48 F.3d 1376, 1383 (4th Cir.1995); *North Carolina Dep't of Correction v. Gibson*, 308 N.C. 131, 141, 301 S.E.2d 78, 85 (1983); *Brewer v. Cabarrus Plastics, Inc.*, 130 N.C.App. 681, 686, 504 S.E.2d 580, 584 (1998). Dr. Jane must therefore establish the same prima facie case used for discriminatory discharge under Title VII. *Hughes*, 48 F.3d 1376. Because Dr. Jane has not been able to prevail on his claims under the Title VII analysis, he is also unable to prevail under § 143–422.2.

In summary, Dr. Jane is unable to show that a reasonable juror could find that Defendants discriminated against him when they dismissed him from their residency program. Defendants' Motion for Summary Judgment is, therefore, GRANTED as to all of Plaintiff's federal and state claims, and such claims are DISMISSED WITH PREJUDICE.

### JUDGMENT

This case is now before the Court on the Defendants' Motion for Summary Judgment [Doc. # 27] pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth in a contemporaneously filed Memorandum Opinion, Defendants' Motion for Summary Judgment is GRANTED as to all of Plaintiff's federal and state claims, and this action is DISMISSED WITH PREJUDICE.